IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| CAROLYN GRAVES, | § | |
| Plaintiff, | § | |
| v. | § | Civil Action No. 3:22-CV-0107-L-BH |
| | § | |
| KILOLO KIJAKAZI, | § | |
| ACTING COMMISSIONER OF SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| Defendant. | § | Referred to U.S. Magistrate Judge[1] |

## FINDINGS, CONCLUSIONS, AND RECOMMENDATION

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for disability insurance benefits (DIB) under Title II of the Social Security Act should be **REVERSED**, and the case should be **REMANDED** for further proceedings.

## I.    BACKGROUND

Carolyn Gates (Plaintiff) filed her application for DIB on June 9, 2020, alleging disability beginning on January 3, 2015. (doc. 8-1 at 229-30.)[2] Her claim was denied initially on September 24, 2020, and upon reconsideration on January 22, 2021. (*Id.* at 66-87.) After requesting a hearing before an Administrative Law Judge (ALJ), she appeared and testified at a telephonic hearing on June 21, 2021. (*Id.* at 32-65.) On August 18, 2021, the ALJ found her not disabled. (*Id.* at 15-25.) On September 29, 2021, Plaintiff appealed the ALJ's decision to the Appeals Council, which denied her request for review on November 12, 2021, making the ALJ's decision the final decision of the Commissioner. (*Id.* at 5-7, 11.) She timely appealed the Commissioner's decision under 42

---

[1] By *Special Order 3-251*, this social security appeal was automatically referred for proposed findings of fact and recommendation for disposition.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

U.S.C. § 405(g). (doc. 1.)

**A.  Age, Education, and Work Experience**

Plaintiff was born on October 29, 1970; she was 49 years old on her date last insured of December 31, 2019. (doc. 8-1 at 33, 41.) She had a college education and could communicate in English. (*Id.* at 41, 222.) She had past relevant work as a bank teller, store salesperson, an animal caretaker, and a security guard. (*Id.* at 41-43, 45-46.)

**B.  Medical, Psychological and Psychiatric Evidence**

On August 6, 2013, Plaintiff presented to Julia C. Graves, M.D. (Internist) at Baylor Scott & White Medical Center (Baylor) complaining of headaches and nausea that cause her to miss work. (*Id.* at 280-82.) She endorsed a long history of migraines as a child and "d[oing] well" through adulthood, but had experienced a "re-emergence" of migraines in the previous 3 years. (*Id.*) She reported three days of "severe" headaches and nausea a week earlier; she could not work and needed help. (*Id.*) She was well developed, in no acute distress, had "grossly intact" neurologic findings, and normal mood, affect, attention span, and concentration. (*Id.* at 280-81.) She was diagnosed with migraine headache and prescribed Maxalt. (*Id.* at 281-82.)

On December 4, 2013, Plaintiff returned to Internist at Baylor for an annual physical. (*Id.* at 283.) Her medical history included headaches and bipolar disorder. (*Id.*) She denied dizziness and irritation but complained of back pain and headaches. (*Id.* at 284.) She was well developed, well nourished, in no acute distress, and had normal mood, affect, attention span, concentration, and no edema in the extremities. (*Id.* at 285.)

On January 15, 2014, Plaintiff visited Internist again; she was well developed, well-nourished, in no acute distress, and had no significant adenopathy. (*Id.* at 291-93.) She was diagnosed with upper respiratory infection, depression, migraine headache, and a cough, and she

was prescribed antibiotics. (*Id.* at 291-92.)

On April 15, 2014, Plaintiff returned to Internist, complaining of lower back pain "shooting" down her back side, which had lasted three days, had been "off and on" in the past, and interfered with her ability to function. (*Id.* at 294-96.) She had a history of headaches, bipolar disorder, and a 2007 work-related back injury. (*Id.*) She was well developed, well nourished, in no acute distress, and had "grossly intact" neurologic findings. (*Id.* at 295.) A back/spine exam showed a limping gait; no ecchymosis, erythema, swelling, curvature/deformity or tufts/patches of hair; tenderness on right and left lumbar paraspinals; and left radiculopathy. (*Id.*) A lumbosacral exam showed she had negative left and right sitting straight leg raises. (*Id.*) She was assessed with lumbar strain and mild lumbar radiculopathy, prescribed cyclobenzaprine, and advised to take Aleve and ice her back twice a day. (*Id.* at 294, 296.)

On July 19, 2014, Plaintiff presented to the Las Colinas Medical Center emergency room (ER) after she tripped at ground level and fell face forward on her knees in a work-related accident. (*Id.* at 264-73.) She complained of face, neck, and bilateral knee pain that was exacerbated by movement and not relieved by anything; she had a Glasgow coma score of 15 and was applied a cervical collar at triage. (*Id.* at 264.) She had post midline tenderness of the cervical spine but no abnormal level of alertness, focal neurological deficits, or "distracting" injuries. (*Id.* at 264-65.) She endorsed abrasion, bruising, contusion, swelling, and neck and extremity pain. (*Id.* at 265.) A computerized tomography (CT) scan of her cervical spine revealed normal cervical spinal alignment and no acute fractures or degenerative changes; a CT scan of her facial bones revealed a small left maxillary soft tissue contusion without any underlying or acute fractures; and a CT scan of her head showed no intracranial abnormalities. (*Id.* at 270-73.) Examination findings were within normal limits except for left periorbital contusion, tender and immobilized cervical spine,

and mild bilateral knee tenderness with soft tissue swelling and abrasion, but full range of motion. (*Id.* at 266.)

On August 8, 2014, Plaintiff presented to The Dallas Wellness Center, P.C., for an initial examination/evaluation by J. Douglas Kirkpatrick, D.C. (Chiropractor). (*Id.* at 543-45.) She reported feeling "immediate" pain and swelling to her neck and shoulders following her work-related accident. (*Id.* at 543.) She complained of constant stiffness, muscle spasm, and 9/10 pain in the bilateral neck; frequent" head pain at 7/10; intermittent bilateral knee pain at 5/10 in both knees; and frequent muscle spasm and lower lumbar pain bilaterally 6/10. (*Id.*) Her "carriage and gait displayed noticeable difficulty", and her movements "seem[ed] to be "slow." (*Id.* at 544.) Cervical distraction for nerve root compression, maximum compression for cervical nerve root compression, shoulder depression for radicular pain, McMurray's Click Test, Valgus Stress Test, Kemp's Test, and Milgram's Test were all positive bilaterally. (*Id.*) Chiropractor found that her symptoms were "consistent" with the work-related accident and her prognosis was "fair"; he assessed her with cervical/brachial syndrome, head contusion, internal derangement of knee, lumbar sprain/strain, and cervical segmental dysfunction. (*Id.* at 544-45.) Chiropractor specifically found that Plaintiff required 12 visits in an 8-week period to return her to "pre-injury" status, increase mobility, and reduce pain and muscle spasm. (*Id.* at 545.)[3] He opined that additional therapy would restore stability and coordination, and he ordered a magnetic resonance imaging (MRI) and an orthopedic evaluation. (*Id.*)

On August 15, 2014, Plaintiff underwent an MRI of the cervical spine due to neck pain. (*Id.* at 533.) It showed normal appearance of the visualized posterior fossa structures, no

---

[3] Plaintiff reported that her job required her to bend, stoop, push, and pull; regularly lift between 20 to 40 pounds and lift no more than 1 hour of an 8-hour workday; perform "repetitive" hand movements such as light grasping with both hands; "regularly" sit 2 to 4 hours, stand 4 to 6 hours, and walk 1 to 2 hours. (*Id.* at 545.)

abnormalities in the soft tissues of the neck, and normal appearance of the craniocervical junction and atlanto-axial articulation. (*Id.*) She was assessed with left paracentral disc herniation at C5-6 with left-sided cord compression, left posterior lateral disc herniation at C4-5 partially covered by marginal osteophyte with abutment left C5 nerve root, and posterior annular disc bulge at C3-4 without neural encroachment. (*Id.* at 534.)

An MRI on August 29, 2014, revealed disc herniations at C4-5 and C5-6, left-sided cord compression at C5-6, and a disc bulge at C3-4; a lumbar spine MRI showed multilevel DDD and facet hypertrophy, but no acute compression deformity. (*Id.* at 529-30, 533-34.)

On September 9, 2014, Plaintiff submitted to electromyography and nerve conduction studies (EMG/NCS), which revealed bilateral C5-6 cervical radiculopathy, but no evidence of brachial plexopathy, focal median, radial or ulnar neuropathies in the elbows or wrists, polyneuropathy, neuromuscular transmission defects, or myopathy. (*Id.* at 531-32.)

On September 24, 2014, Chiropractor performed a re-evaluative examination. (*Id.* at 546.) Plaintiff complained of frequent pain in the bilateral region of the neck; intermittent head and bilateral knee pain; and frequent muscle spasm and lower lumbar pain bilaterally. (*Id.*) An orthopedic evaluation revealed improvement in range of motion in Plaintiff's cervical and lumbosacral spine and knees. (*Id.* at 546-47.) Chiropractor noted shoulder depression for radicular pain positive bilateral and positive bilateral Valgus Stress Test, Kemp's Test, and Milgram's Test. (*Id.* at 546.) He continued her diagnoses and found that her prognosis was still fair. (*Id.* at 547.) He also found that she had completed physical therapy for her cervical spine and bilateral knees and her strength and range of motion had improved in those areas. (*Id.*) He noted, however, that she had not received any physical therapy or rehabilitation of her lumbar spine because it had been determined to not be a "compensable" body part. (*Id.*) He noted his agreement with Orthopedic

Surgeon's recommendation that she receive physical therapy for her lumbar spine. (*Id.*)

On November 21, 2014, Chiropractor performed a second re-evaluative examination. (*Id.* at 549-50.) Plaintiff reported frequent muscle spasm, stiffness, and pain in the bilateral neck, intermittent head and bilateral knee pain, and frequent muscle spasm and lower lumbar pain bilaterally. (*Id.* at 549.) An orthopedic evaluation revealed continued improvement in range of motion in Plaintiff's cervical and lumbosacral spine and knees. (*Id.* at 549-50.) She still had shoulder depression for radicular pain positive bilateral and was positive bilateral in Valgus Stress Test and Kemp's Test. (*Id.* at 549.) Chiropractor continued her diagnoses and opined that her prognosis remained fair. (*Id.* at 550.) Plaintiff had received 10 physical therapy visits for her lumbar spine, she had improved range of motion, and her pain had decreased. (*Id.*) He noted that she was back at work "but with restrictions". (*Id.*) He opined that she was "currently not medically stationary" and ordered 6 visits for a period of 4 weeks to increase mobility and reduce pain and muscle spasms, which would allow Plaintiff to return to work full duty status. (*Id.*)

On November 25, 2014, Plaintiff presented to Baylor for a preventative care screening. (*Id.* at 300-302.) She was well developed, well nourished, and in no acute distress, and she had tender left anterior cervical node. (*Id.* at 300.) Changes were made to her medications. (*Id.* at 300-01.)

On March 24, 2015, Plaintiff presented to Texas Bone & Joint Center for a "comprehensive" orthopedic physical examination by Deepak Chavda (Orthopedic Surgeon). (*Id.* at 535, 538.) She reported neck and back pain, not doing physical therapy, and taking Celebrex and an anti-inflammatory cream; a handwritten note on the medical record indicated that her pain "fluctuate[d]" with activity. (*Id.*) A cervical spine exam revealed tenderness to the cervical paraspinals musculature, full radial pulses of the bilateral upper extremities, grossly intact cranial nerves II-XII, and decreased deep tendon reflexes of the left biceps versus the right. (*Id.* at 535.)

A thoracic spinal exam showed point tenderness on palpation of the thoracic paraspinous musculature and limitation on full flexion and extension of the thoracic spine. (*Id.*) A lumbar spine exam revealed tenderness to palpation of the lumbar paraspinous musculature and L5 region, "equivocal" straight leg raising on the left at 65 and right leg at 65 degrees, hyper-reflexive along the right ankle but an ability to toe and heel walk well. (*Id.*) Orthopedic Surgeon found tenderness to touch in the bilateral sacroiliac joints and positive Patrick/Fabere test, Yeoman's test, and Gaenslen's test/maneuver. (*Id.* at 536.) The left and right knee exam revealed minimal swelling, range of motion from -5 to 130 degrees, positive crepitation, tenderness along the joint line, and intact distal neurovascular status. (*Id.*) He diagnosed her with several conditions relating to her cervical spine, thoracic spine, lumber spine, bilateral sacroiliac spine, bilateral knees, face, scalp, and neck. (*Id.*) He continued her medications and referred her for epidural steroid injections and an "advancing" physical therapy program and/or "active care program". (*Id.* at 537-38.) He checked a box on a Texas Workers' Compensation Work Status Report dated the same day indicating that Plaintiff's medical condition resulting from the work-related injury had prevented, and continued to prevent, her from returning to work as of that day. (*Id.* at 539.)

On July 13, 2015, Plaintiff presented to Center for Pain Relief for pain in her neck, lower back, and backside. (*Id.* at 487.) She reported that a steroid injection, doing exercises, and "other modalities", were "not effective". (*Id.*)

On September 3, 2015, Plaintiff returned to the Center for Pain Relief for neck and lower back pain. (*Id.* at 501.) She complained of pain down her neck toward both shoulders and in her upper and lower back, although physical therapy had helped "some". (*Id.*) She had tingling down her arms and bilateral legs but no weakness or numbness. (*Id.*) Her treatment plan included cervical epidural steroid injection (CESI) for C5-6 with very little sedation and possibly at C4-5, and facet

injections at C5-6, L3-4, and L4-5. (*Id.*) She was diagnosed with multilevel degenerative disc disease and cervical radiculopathy and was prescribed Hydrocodone and Flexeril. (*Id.*)

On September 15, 2015, Plaintiff presented to Pine Creek Surgery Center for a C5-6 epidural procedure by Manuel Ramirez, M.D. (Pain Doctor). (*Id.* at 525-26.) She was diagnosed preoperatively with multilevel degenerative disc disease and cervical radiculopathy; a CESI, myelogram "without dural puncture" and spinal injection of local anesthetic were administered. (*Id.* at 525.)

On October 1, 2015, Plaintiff presented to Center for Pain Relief complaining of neck and lower back pain. (*Id.* at 500.) She reported that physical therapy had helped "some", she had tingling down the arms and bilateral legs but no weakness and numbness, and that the September 2015 CESI helped about 65 percent. (*Id.*) She was still having some upper neck pain, but her shoulder area was better, and her lower back pain was "still" a problem. (*Id.*) Her plan of care included L3-4 and L4-5 facet injections. (*Id.*)

On October 13, 2015, Plaintiff presented to Pain Doctor at Pine Creek Surgery Center for lower back pain. (*Id.* at 523-34.) She was administered facet injections at bilateral L3-4 and bilateral L4-5 and was diagnosed with multilevel degenerative disc disease. (*Id.* at 523.)

On November 24, 2015, Plaintiff presented to Center for Pain Relief, complaining of neck and lower back pain, including in between her shoulder blades, despite receiving lumbar facet injections. (*Id.* at 497.) Her medications included Lexapro, Bupropion, Lamotrigine, Inderal, Hydrocodone, Flexeril, Ibuprofen, and Naproxen. (*Id.*) She was diagnosed with multilevel degenerative disc disease, myofascial pain, and cervical radiculopathy. (*Id.*)

On December 15, 2015, Plaintiff returned to Pain Doctor at Pine Creek Surgery Center for a facet injection. (*Id.* at 521-22.) She underwent injections at bilateral C4-5, bilateral C5-6, right

scapular, and right thoracic paraspinal. (*Id.* at 521.) She was diagnosed with multilevel degenerative disc disease and myofascial pain syndrome. (*Id.*)

On June 8, 2016, Plaintiff presented to Pine Creek Medical Center for an MRI of the cervical spine without contrast. (*Id.* at 527.) It revealed normal cervical alignment, normal bone marrow signal of the cervical spine, and normal signal intensity. (*Id.*) At C5-6, small posterior osteophytes were seen with mild diffuse bulging of the annulus fibrosis, most prominent along the left paracentral margin where broad-based disc protrusion was seen. (*Id.*) At C4-5, there was minimal left lateral osteophyte formation. (*Id.*) She was diagnosed with a left paracentral disc protrusion C5-6 with associated small osteophyte formation. (*Id.*)

On February 21, 2018, Plaintiff attended a primary care consultation with Jennifer Mata, PA-C (Physician Assistant) at Healthcare Associates of Irving (Healthcare Associates). (*Id.* at 388-90.) Plaintiff complained of fatigue, medication changes, shakiness, facial numbness/tingling, head injury, neck pain and stiffness, back pain, decreased range of motion, joint pain and stiffness, muscle cramps and pain, headaches, restless sleep, tingling, visual changes, anxiety, irritability, mood changes, nervousness, and panic attacks. (*Id.* at 388-89.) She was well-groomed and had normal cardiac borders and normal abdomen and lymphatic findings. (*Id.* at 389.) She was assessed with anxiety and migraines and was prescribed Promethazine, Rizatriptan, Naproxen, Alprazolam, Lamotrigine, and Bupropion. (*Id.*) Physician Assistant found that Plaintiff's migraines were "controlled". (*Id.*) She also noted that Plaintiff received pain management from Pain Doctor, would begin seeing a psychiatric nurse practitioner in April 2018, and had suffered lumbar disc herniations while carrying a dog at her job. (*Id.*)

On June 20, 2018, Plaintiff visited Physician Assistant at Healthcare Associates for anxiety and a follow-up. (*Id.* at 383-85.) She reported that the onset of her psychological condition had

been "gradual" but "persistent" for years, she was taking mood stabilizers, and she was scheduled for a psychiatric appointment. (*Id.* at 383.) She denied any pain and had a normal physical examination. (*Id.* at 384.) No changes were made to her prior diagnoses or medications. (*Id.*)

On July 10, 2018, Plaintiff presented to Healthcare Associates, complaining of neck pain and stiffness, back and joint pain, anxiety, irritability, frequent crying, mood changes, and nervousness; she denied any other pain. (*Id.* at 382.)

The next day, Plaintiff presented to Marya Wright PMHNP-BC (Psychiatric Nurse Practitioner) at Healthcare Associates for an initial psychiatric evaluation. (*Id.* at 379-81.) Plaintiff reported that she had been treated for anxiety since age 19, had "tried most of old [prescriptions]", had a history of weight gain on medications, and had been on the same prescription since 2015, but it was not stable. (*Id.* at 379.) Therapy in the past was "[n]ot a good fit", and she had been hospitalized for MDD four times between 1991 and 1998. (*Id.*) She suffered a head injury when she fell off a teeter totter in 1976 but had no altered level of consciousness. (*Id.*) She lived with her spouse, exercised four times a week, and was unemployed. (*Id.*) She complained of depression "every few weeks to months", oversleeping on days off, poor energy due to chronic pain, good motivation that was limited by pain, word recall issues within the prior year, irritability with verbal abuse, racing thoughts, mood swings, headaches and nausea in the morning, and occasional suicidal ideation but no plan/intent. (*Id.*) She reported anxiety at 6 or 7 out of 10, such as with driving due to a car accident, obsessive worrying, negative thinking, perfectionism, chest pain, and nausea two to three times a week. (*Id.* at 379-80.) Her hobbies included cooking, caring for chickens, maintaining the house, and taking care of her dogs. (*Id.* at 380.) She was alert and oriented times four, cooperative and friendly, and had normal gait and station and normal strength and tone with no atrophy, spasticity, or tremors. (*Id.*) A neuropsychiatric examination revealed

behavior within normal limits, intact remote memory and associations, and no "current" suicidal or homicidal ideation, but anxious and labile mood and affect, distracted concentration, fair judgment and insight, impaired immediate and recent memory, and abnormal or psychotic thoughts, including compulsions and obsessions. (*Id.* at 379.) She was referred for psychiatric medication management and supportive therapy and advised to consider CBT and stress management techniques. (*Id.*) She was diagnosed with type II bipolar disorder and was started on Aripiprazole, Lamictal, Lexapro, Wellbutrin, and Xanax. (*Id.* at 380-81.)

On July 13, 2018, Plaintiff presented to Center for Pain Relief for pain in her neck and backside. (*Id.* at 487.) She complained of burning and shooting pain in the right scapular area, headaches, nausea, and "some" depressive episodes. (*Id.*) She reported that Acetaminophen and nonsteroidal anti-inflammatory drugs (NSAIDS) did not help, and that she had tried to go back to work part-time, but it did not work out. (*Id.*) She was diagnosed with multilevel degenerative disc disease, myofascial pain, cervical radiculopathy, and left sacroiliac joint syndrome. (*Id.*)

On July 17, 2018, Plaintiff presented to Pain Doctor at Pine Creek Medical Center complaining of sacroiliac joint dysfunction that was worse on the left side. (*Id.* at 519-20.) She was diagnosed with multilevel degenerative disc disease, myofascial pain, cervical radiculopathy, and left and right sacroiliac joint syndrome, and received steroid injections to the bilateral sacroiliac joint. (*Id.* at 519.)

On five occasions between August 15, 2018, and March 20, 2019, Plaintiff presented to Psychiatric Nurse Practitioner at Healthcare Associates for a follow-up. (*Id.* at 367-76.) She reported doing "okay" or "doing better" in September and November; some symptoms were improving, including headaches, "decreased" rage and irritability, better mood swings, better motivation unless she was in pain, good sleep with some initial insomnia, no panic, no suicidal or

homicidal ideation, better energy unless there was a meltdown, and less racing thoughts. (*Id.* at 367, 369, 371, 373, 375.) She also reported anxiety and symptoms of depression, including tearful mood and affect, restlessness and an inability to sit still, poor concentration, obsessive worrying, intrusive thoughts, especially at night, frustration due to physical limitations, morning nausea, and fatigue in September and February. (*Id.*) The findings of her neuropsychological examination remained mostly the same. (*Id.* at 368-69, 373-76.) At each visit, her diagnosis was continued, and changes were made to her medications. (*Id.* at 368, 370, 372, 374, 376.)

On March 21, 2019, Plaintiff presented to Center for Pain Relief for pain in her back and back side. (*Id.* at 483.) She reported having multiple injections in the past; the pain medications were helping, the pain in her back side "ha[d] been better", and she was continuing to manage with the medications, which had not changed. (*Id.*) She was unable to stand "for long", however. (*Id.*) She was advised to continue her medications, consider reduction mammoplasty, continue losing weight to 150 pounds, and try stretching and walking try to reduce narcotic medications. (*Id.*)

On April 3, 2019, Plaintiff presented to Psychiatric Nurse Practitioner at Healthcare Associates for bipolar II treatment. (*Id.* at 365-66.) She reported decreased motivation, depression at 8/10, "fair" sleep, tearful, intrusive thoughts, "fair" emergency, anxiety at 7/10, some irritability but no outbursts, mood swings, obsessive worrying, and negative thinking, but no suicidal or homicidal ideation, racing thoughts, or panic. (*Id.* at 365.) A psychiatric examination revealed anxiety, depression, feeling safe at home, frequent crying, insomnia, mood changes, and nervousness. (*Id.*) A neuropsychiatric examination revealed no changes, except she was hyperactive and had psychomotor agitation, and she had anxious, depressed, and tearful mood and affect. (*Id.* at 365-66.) She was diagnosed with type I bipolar disorder, and changes were made to her medications. (*Id.* at 366.)

On 7 occasions between April 17, 2019, and December 9, 2019, Plaintiff presented to Psychiatric Nurse Practitioner at Healthcare Associates for a follow-up. (*Id.* at 344-64.) At most visits, she endorsed feeling better, less overwhelmed, more productive, good energy, better mood and motivation, good sleep with some initial insomnia, better-working pain medication, decreased headaches, minimal rage, and less irritability. (*Id.* at 344, 348, 350, 358, 360-61, 363.) She consistently reported anxiety, racing and intrusive thoughts, poor concentration, obsessive worrying, negative thinking, and/or paranoia while driving or riding in a car. (*Id.* at 344, 348, 350, 352, 355, 358, 360, 363, 365.) She endorsed depression at each visit except in April. (*Id.*) In May, June, and July, she reported poor energy, "not doing well", excessive sleep, increased headaches, and "some passive" suicidal ideation. (*Id.* at 352, 355, 358.) A neuropsychiatric examination revealed no changes, except she had psychomotor agitation and anxious mood and affect. (*Id.* at 349-51, 356, 359, 363-64.) Her diagnosis was continued at each visit, and changes were made to her medications in May, July, and September. (*Id.* at 346, 349-51, 356, 359, 361, 364.)

On July 29, 2020, Plaintiff's spouse (Spouse) completed a Third Party Adult Function Report. (*Id.* at 201-08.) She alleged that Plaintiff had difficulty sleeping and woke up "several times a night" due to pain, required help with "anything", had about 5 migraines a month, and could not use the computer due to neck pain, stand for more than 2 or 3 minutes at once, or lift more than 5 pounds. (*Id.* at 201-02.) She also alleged that Plaintiff spent the day walking to the living room, sitting in her chair, and watching television; she did not cook, do housework, or take care of their dogs. (*Id.* at 202.) Spouse stated that Plaintiff had difficulty lifting her arms over her head, bending, and turning her head, so she helped her dress, bathe, and wash her hair. (*Id.*) She also stated that Plaintiff drove, went out every day, and could be unaccompanied, but she did not shop. (*Id.* at 204.) Plaintiff's neck injury was "aggravat[ed]" by reading a book or using the

computer. (*Id.*) Plaintiff did not have problems getting along with others but did not socialize with anyone except Spouse. (*Id.* at 205-06.) Spouse indicated that Plaintiff had difficulty with squatting, reaching, kneeling, stair climbing, memory, and completing tasks, but not with sitting, understanding, following instructions, and using her hands. (*Id.* at 206.) Plaintiff could walk about 15 to 20 feet before needing to rest about 5 to 10 minutes, had difficulty with concentration, could pay attention for about 10 to 15 minutes, and could follow written and spoken instructions if she did only one step at a time. (*Id.*) Plaintiff did not handle stress or changes well, and she was anxious while riding in the car. (*Id.* at 207.) Spouse did not check off any boxes on the form to indicate that Plaintiff used any kind of assistive devices. (*Id.*)

On September 24, 2020, state agency medical consultant (SAMC) Dennis Pacl, M.D. completed a medical evaluation based on a case review of Plaintiff's medical evidence of record. (*Id.* at 66-70.) He first considered that Plaintiff had alleged disability based on cervical spine with radiculopathy, chronic lower back pain, and at least one migraine a week. (*Id.* at 70.) He opined that a consultative examination was not required. (*Id.* at 68.) He considered a July 2020 physical examination that found that Plaintiff was alert, in no distress, obese, and had elevated glucose levels, uncontrolled diabetes mellitus, and headaches, as well as a December 2019 physical examination by Psychiatric Nurse Practitioner noting that Plaintiff reported anxiety, agoraphobia, depression, back pain, intrusive thoughts, and mood swings, but no anger and good sleep. (*Id.* at 69.) He noted that there were no hospitalizations or ER visits due to mental or physical allegations. (*Id.* at 69-70.) He concluded that there was insufficient evidence in the file to address severity prior to the date last insured. (*Id.*)

The same day, state agency psychological consultant (SAPC) Joel Forgus, Ph.D., completed a psychiatric review technique based on a case review of Plaintiff's medical evidence

of record and as of her date last insured. (*Id.* at 70-73.) He opined that she had the severe impairments of diabetes mellitus; depressive, bipolar and related disorders; and anxiety and obsessive-compulsive disorders. (*Id.*) He considered Listings 12.04 and 12.06 but found that the depressive or anxiety disorders did not "precisely" satisfy the paragraph A criteria, and that there was insufficient evidence to satisfy the paragraph B or C criteria. (*Id.* at 70-71.) He also considered Plaintiff's December 2019 psychiatric and mental status examination, finding that although the medical evidence of record was sufficient, there was insufficient "functional evidence" for a medical determination prior to the date last insured. (*Id.* at 71.) There was no mental RFC assessment or indication that there was a medical opinion from any medical source. (*Id.* at 72.)

On January 15, 2021, SAMC Amita Hegde, M.D., completed a medical evaluation based on Plaintiff's medical evidence of record. (*Id.* at 75-81.) She considered the medical conditions that Plaintiff alleged as bases for disability, as well as her July 2020 diagnosis of type II diabetes mellitus and the evidence reviewed at the initial disability determination, her February 2018 physical examination, and her October 2020 diabetes check. (*Id.* at 76-77.) She also noted that evidence had been requested, including from Pain Doctor. (*Id.* at 79.) She too opined that a consultative examination was not required and that there was insufficient evidence prior to the date last insured to establish disability. (*Id.* at 80-81.)

On January 11, 2021, SAPC Renate Wewerka, Ph.D., completed a psychiatric review technique based on a case review of Plaintiff's medical evidence of record. (*Id.* at 81-83.) She made the same findings as SAPC Forgus, including that there was insufficient functional evidence for a medical determination prior to date last insured. (*Id.* at 83.) There was no mental or physical RFC assessment, and no indication that there was a medical opinion from any medical source. (*Id.* at 84.)

On March 3, 2021, Plaintiff presented to Psychiatric Nurse Practitioner at Healthcare Associates for a follow-up. (*Id.* at 336-38.) She denied anger, headaches, panic, or suicidal or homicidal ideation, and reported fair concentration, using minimal Xanax, being active, and starting a garden. (*Id.* at 366.) She also reported daily back pain, mild paranoia, intrusive thoughts, some mood swings, obsessive worrying, negative thinking, and racing thoughts. (*Id.*) She denied fatigue or difficulty sleeping but endorsed overall good health, anxiety, and depressed mood. (*Id.* at 337.)  A psychiatric examination revealed no changes, except that she had poor attention, fair impulse control, and fair insight and judgment. (*Id.* at 338.) Her diagnoses were continued, and her medication dosages were changed. (*Id.*)

In tele-visits on June 2, 2020, and July 1, 2020, Plaintiff presented to Psychiatric Nurse Practitioner at Healthcare Associates for a follow-up. (*Id.* at 328-35.) She reported good sleep and "[d]oing ok" and denied paranoia/anger and nightmares. (*Id.* at 328, 332.) She also reported depression in the summer, increased anxiety, fatigue, and weakness, decreased motivation, feeling overwhelmed, some headaches, poor concentration, obsessive worrying, some or mild panic, racing thoughts, and intrusive thoughts of hurting herself. (*Id.*) A psychiatric examination revealed no changes, her diagnoses were continued, and her medication was changed. (*Id.* at 330, 334.) In July 2020, she reported that she was unable to read a book. (*Id.* at 328.)

On July 9, 2020, Plaintiff presented to Karen Davidson, FNP (Family Nurse Practitioner) at Healthcare Associates for a diabetes check. (*Id.* at 324.) She was assessed with obesity, elevated glucose level, uncontrolled diabetes mellitus, and headaches, but no other abnormalities. (*Id.*) She was prescribed a glucose monitor system kit, and her medications were refilled. (*Id.* at 324-25.)

In tele-visits on July 29, 2020 and September 24, 2020, Plaintiff presented to Psychiatric Nurse Practitioner at Healthcare Associates for a follow-up.  (*Id.* at 317-23.) She reported feeling

less tired, waking up less, less body pain, and an ability to sit still "little better", but she had increased anxiety and depression, poor concentration, and obsessive worrying. (*Id.* at 317, 321.) A physical examination found good overall health, but also fatigue, anxiety, and depressed mood. (*Id.* at 319, 321-22.) A psychiatric examination found no changes, except her psychomotor activity was within normal range. (*Id.* at 322-23.) Her diagnoses and medications were continued. (*Id.* at 319, 323.) In July 2020, she endorsed an inability to tolerate waiting. (*Id.* at 317.)

On October 5, 2020, Plaintiff presented to Family Nurse Practitioner at Healthcare Associates for a diabetes follow-up. (*Id.* at 314-16.) Her diabetes had presented in adulthood and was at a mild level of severity and an overall "variable" condition. (*Id.* at 314.) She was alert, cooperative, in no distress, and had intact cognitive function and good mood/affect. (*Id.*) Family Nurse Practitioner assessed her with uncontrolled diabetes mellitus and headaches and found that medication compliance alleviated her symptoms. (*Id.* at 314-15.)

## C. June 21, 2021 Hearing

On June 21, 2021, Plaintiff and an impartial VE testified at a hearing before the ALJ. (*Id.* at 32-65.) Plaintiff was represented by an attorney. (*Id.*)[4]

### 1. *Plaintiff's Testimony*

Plaintiff confirmed her date of birth and testified that she had earned a bachelor's degree in History and Political Science in December 2005. (*Id.* at 41.)

Plaintiff testified that she last worked as a bank teller at Regions Bank from 2009 through

---

[4] The attorney referenced Plaintiff's request for a consultative examination with an internist as well as a psychological evaluation for a review of records, interview mental status, and completion of medical source statements. (doc. 8-1 at 37.) She contended that the SAMCs and SAPCs found Plaintiff had severe impairments but that there was insufficient evidence prior to the date last insured, and that the data needed to be "interpreted" by medical and mental health experts and professionals. (*Id.* at 37-38.) The ALJ responded that medical experts (MEs) who could specifically address the date last insured issue might be more appropriate, but he decided to "hold off" on deciding whether to obtain an ME until all the records had been submitted after the hearing. (*Id.* at 39-40.)

January 2015. (*Id*. at 42.) In 2007, she worked as an unarmed security guard at Whelan Security for 3 months; she initially worked full-time but went to part-time (three days a week) after a month and a half. (*Id.* at 42-43.) She sat at the reception desk most of the time and was on her feet for 15 percent of the time. (*Id.* at 43.)

For 9 months beginning in February 2006, Plaintiff worked in the small pet section of PetSmart, where she sold fish, birds, and supplies. (*Id.* at 45.) She then worked in the boarding kennel section, where she cleaned the kennels and fed and walked the dogs. (*Id.* at 43-45.) After 6 weeks there, she was promoted to a supervisory position, which she held for 8 months. (*Id.* at 44-46.) She worked primarily on her feet doing the same job as her 12 employees. (*Id.*)

On cross-examination, Plaintiff testified that she was 5'7" tall and weighed 165 pounds. (*Id.* at 46-47.) She had lost 40 pounds within the prior 4 years due to medication changes and anxiety. (*Id.* at 47.) She was right-handed, her hands trembled, and she had difficulty reaching forward and overhead. (*Id.*) She no longer folded clothes because of the pain and could not reach for a coffee cup placed anywhere "taller" than her. (*Id.*) She did not have difficulty opening or closing jars, but she had trouble opening medicine bottles with childproof lids because her hands shook, and it required her to turn the lid at the same time. (*Id.* at 48.)

Since experiencing a work-related injury in July 2014, Plaintiff had been treated for chronic neck and lumbar pain and radiculopathy, which traveled down her neck to her arms. (*Id.*) She had undergone numerous injections for pain management. (*Id.*) The first one helped relieve headaches for "a little while", but "ultimately" it did not help. (*Id.*)

Once per week on average, Plaintiff suffered from headaches that could last anywhere from 2 hours to 2 days. (*Id.* at 49.) They would get to the point where she could not lie down or sit, and standing was "very painful"; the "immense" pain came with nausea and sensitivity to light, sound,

and heat. (*Id.*) She had been prescribed Maxalt for a while, and at the time she was taking Propranolol as a preventative in the morning and in the evening, which she believed helped. (*Id.*) She had been prescribed Naproxen and another medication for the onset of the headache. (*Id.* at 49-50.) She sometimes also put an ice pack on her head and had to "wait it out". (*Id.* at 50.)

When Plaintiff fell at work, she "snapped [her] neck". (*Id.*) If she irritated it, a sharp or dull pain went down either arm, but mostly her right arm, into her fourth or fifth finger, and it also caused "severe" spasms in the muscles by the scapula. (*Id.*) Plaintiff had "re-injured" her neck numerous times, including in another work-related injury prior to the one in July 2014 and in a 2015 car accident. (*Id.*) Daily life activities, like reaching, doing things at chest level with her hands, and standing, caused her pain. (*Id.*)

Plaintiff was able to stand for two to three minutes; at the fifth minute she would be "near" "miserable", and at the tenth minute she would be "looking for a way" to not stand anymore. (*Id.* at 51.) She avoided standing in one place at all costs. (*Id.*) She could walk about 100 yards before she needed to rest for at least 10 minutes, but it depended on how "irritated" her neck was. (*Id.*) She could walk better than she could stand or sit. (*Id.*) She could lift and carry 10 pounds "on and off" throughout the day. (*Id.*) She could sit upright in an office chair for about 5 minutes, but "regular straight" back chairs, like at a restaurant, were "not good" for her. (*Id.*) At home, the couch and dining room table gave her trouble, so she sat in a recliner in the living room for about 6 hours, although not at all once. (*Id.* at 52.)

Plaintiff had been treated for bipolar disorder since she was 19 years old. (*Id.*) In January 2015, she was treated by physicians Trina Bivens and Sherry Huey, both of whom prescribed her medications. (*Id.*) She was then treated by Physician Assistant and by Psychiatric Nurse Practitioner in June 2018. (*Id.*) Plaintiff's symptoms included anxiety, which was exhausting, and

mood swings throughout the day or for up to two weeks at a time. (*Id.* at 53.) Her mood swings went from depressed (thinking she could not do anything) to grandiose (thinking she could do "so much more" than she could do). (*Id.*) After "reach[ing] [her] limitations", she got depressed, which affected everything, including her ability to do housework, care for her animals, drive, and take care of her hygiene. (*Id.*) Driving while depressed was challenging for her both mentally and physically because she was paranoid about getting into a wreck; other drivers sent her into a rage, and she was limited in her ability to turn her neck to merge or change lanes. (*Id.*)

When Plaintiff felt grandiosity, she got ideas of things that she wanted to do and should be able to do. (*Id.* at 54.) Because she and Spouse had chickens, she might think she could fix the leaking roof on the chicken coop; ultimately, however, "all [she] c[ould] do [wa]s to sit there and watch." (*Id.*) She would feel like she could cook gourmet foods, but once she got into the kitchen, she could not stand "long enough" to do it. (*Id.*) She was hyperactive and got on Spouse's nerves by asking for something to be done when Spouse had just gotten home from work and needed to rest. (*Id.*) Due to restlessness, anxiety, and inability to sit still and relax, she had not watched a movie from beginning to end in years, and she had not been able to read, which she had done a lot of in the past. (*Id.*) She reported this to Psychiatric Nurse Practitioner. (*Id.* at 54-55.) She denied having any issues with spending money that she did not have. (*Id.* at 54.)

If Plaintiff was feeling up to it both mentally and physically, she and Spouse had an outing about twice a month, usually to visit Spouse's father or attend a festival. (*Id.* at 55.) They had attended two festivals that spring and summer, staying as little as 30 minutes and not more than three or four hours, depending on her pain from walking or her anxiety due to crowds. (*Id.* at 55-56.) She would not be able to go by herself due to the need to stand in line. (*Id.*) When Plaintiff was overwhelmed or stressed, she coped by lying in bed, which she called "resetting" herself. (*Id.*

at 56.) She cut off all stimulation, focused on breathing, and took medication for anxiety. (*Id.*) These issues were present before January 2015, but they worsened after she began having neck and back pain due to her July 2014 work accident, which complicated the "mental situation." (*Id.*)

Plaintiff had started to miss work due to headaches in 2013. (*Id.*) Things got worse after the July 2014 work-related accident. (*Id.* at 57.) She had stopped working in January 2015. (*Id.*)

### 2. *VE's Testimony*

The VE testified that she was familiar with the Dictionary of Occupational Titles (DOT) and its "companion publication." (*Id.* at 58.) She affirmed that if her testimony conflicted with the jobs listed in those publications, she would bring it to the ALJ's attention to "rectify" any inconsistencies and provide him with a basis for her testimony. (*Id.*)

The VE "characterize[d]" Plaintiff's past work as bank teller (DOT 211.362-018, light, skilled, SVP-5), pet store salesman (DOT 277.357-042, light, semi-skilled, SVP-4), animal caretaker (DOT 410.674-010, medium, semi-skilled, SVP-4), which included the supervisory work, and security guard (DOT 372.667-034, semi-skilled, SVP-3), which was generally performed light but sedentary as she performed it. (*Id.* at 58-59.)

The VE first considered a hypothetical individual who had Plaintiff's age, education, and past work experience, and who performed work at the light range of exertion, except she could frequently use either upper extremity to reach, handle finger, and feel; could occasionally stoop, crouch, crawl, kneel, climb stairs and ramps, but not climb ladders, ropes, or scaffolds; and could occasionally use foot controls, but not work in proximity to unprotected heights and dangerous moving machinery. (*Id.* at 59-60.) The individual could also understand, remember, and carry out short, simple instructions; perform simple, routine tasks with no fast paced, high quota production work; make only simple work-related decisions; adapt to few, if any, workplace changes; and

21

tolerate only occasional interaction with co-workers, supervisors, and the general public. (*Id.* at 60.) The VE opined that although the first hypothetical individual could not perform past work, she could perform work in the light range, including as a price marker (DOT 209.587-034, light, unskilled, SVP-2), with 129,388 jobs nationally; hotel housekeeper (DOT 323.687.014, light, unskilled, SVP-2), with 220,258 jobs nationally; and mailroom clerk (DOT 209.687-026, light, unskilled, SVP-2), with 12,938 jobs nationally. (*Id.* at 60-61.)

The VE next considered a second hypothetical individual who had the same RFC as the first but could occasionally (not frequently) reach, handle, finger, feel. (*Id.* at 61.) The individual would not be able to perform any light jobs. (*Id.*)

The VE considered a third hypothetical individual who had the same RFC as the first but who was limited to sedentary work. (*Id.*) The individual could perform work as a document preparer (DOT 249.587-018, sedentary, unskilled, SVP-2), with 18,988 jobs nationally; tube operator (DOT 239.687-014, sedentary, unskilled, SVP-2), with 2,967 jobs nationally; and addresser (DOT 209.587-010, sedentary, unskilled, SVP-2), with 2,690 jobs nationally. (*Id.*)

The VE considered a fourth hypothetical individual who had the same RFC as the first hypothetical individual, but who was limited to sedentary work and could perform occasional (not frequent) manipulative functions. (*Id.*) There would be no sedentary jobs that the individual could perform. (*Id.*)

The VE considered fifth and sixth hypothetical individuals who had the same RFC as the first and third, respectively, but due to an underlying bipolar disorder, would be absent from work an average of two days a month. (*Id.* at 62.) Those individuals would not be able to perform or maintain any competitive employment. (*Id.*) Because the DOT did not address absenteeism, the VE based her answer on her own job placement experience. (*Id.*)

The VE considered seventh and eight hypothetical individuals who had the same RFC as the first and third hypothetical individuals, respectively, but who would be unable to maintain attention and concentration for two-hour blocks of time. (*Id.*) They would not be able to perform or maintain any competitive work. (*Id.*) Because the DOT did not address attention and concentration, the VE also based this answer on her job placement experience. (*Id.*)

The VE considered ninth and tenth hypothetical individuals who had the same RFC as the first and third, respectively, but who needed to periodically alternate between sitting, standing, and walking, and to occasionally lie down, during an 8-hour workday. (*Id.* at 62-63.) These individuals would not be able to perform or maintain any competitive employment. (*Id.* at 63.) The VE testified that an alternating position requirement was another area not discussed by the DOT, so her answer was again based on her job placement experience. (*Id.*)

On cross-examination, the VE testified that in preparation for the hearing she looked at the "disability records", specifically the adult disability report and any work history reports.[5] (*Id.*) She denied considering any other factors other than those posed in the ALJ's hypotheticals. (*Id.*)

The VE testified that the six SVP-2 jobs at the light and sedentary levels of exertion could be learned in "up to 30 days." (*Id.* at 64.) In providing these jobs, the VE had referred to sources, including SkillTRAN and Job Browser Pro. (*Id.*)

**D. ALJ's Findings**

The ALJ issued an unfavorable decision on August 23, 2021. (*Id.* at 25.) At step one, he found that Plaintiff had not engaged in substantial gainful activity between her alleged onset date of January 3, 2015, through her date last insured of December 31, 2019. (*Id.* at 18.) At step two,

---

[5] Plaintiff's attorney referred to these documents as the disability related development documents in Section E of the medical evidence of record. (doc. 8-1 at 63.)

he found that Plaintiff had the severe impairments of degenerative disc disease of the cervical and lumbar spines, diabetes mellitus, peripheral neuropathy, migraine headaches, depression, and anxiety, and the non-severe impairments of hyperlipidemia, leukocytosis/neutrophilia, and acid reflux. (*Id.*) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d), 416.925-416.926). (*Id.*) He expressly considered Listing 1.15 (disorders of the skeletal spine resulting in compromise of a nerve root(s)), Listing 1.16 (lumbar spinal stenosis resulting in compromise of the cauda equina), Listing 9.00 (endocrine disorders), Listing 11.14 (peripheral neuropathy), Listing 12.04 depressive, bipolar, and related disorders), and Listing 12.06 (anxiety and obsessive-compulsive disorders). (*Id.* at 18-20.)

Next, the ALJ determined that Plaintiff retained the physical residual functional capacity (RFC) to perform light work, as defined in 20 C.F.R. § 416.967(b), except she could:

> frequently use either upper extremity to reach, handle, finger and feel; could occasionally stoop, crouch, crawl and kneel; could not climb ladders, ropes or scaffolds; could occasionally climb stairs and ramps; could not work in proximity to unprotected heights and dangerous moving machinery; could use foot controls occasionally; could understand, remember and carry out short, simple instructions; could perform simple, routine tasks with no fast-paced high quota production work; could make only simple work related decisions; could adapt to few, if any, workplace changes and could tolerate only occasional interaction with coworkers, supervisors and the general public.

(*Id.* at 20.) At step four, he found, based on the VE's testimony, that Plaintiff could not perform her past relevant work as a bank teller, pet store salesman, animal caretaker, and security guard. (*Id.* at 24.) At step five, he found that transferability of job skills was not material to the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled regardless of whether she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the

national economy that she could perform. (*Id.* at 24-25.) The ALJ determined that Plaintiff had not

been under a disability, as defined by the Social Security Act, at any time from the alleged onset

date of January 3, 2015, through the date last insured of December 31, 2019. (*Id.* at 25.)

## II.    STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the

Commissioner's position is supported by substantial evidence and whether the Commissioner

applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236

(5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a

reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558,

564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not

reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the

record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding

of no substantial evidence is appropriate only if there is a conspicuous absence of credible

evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson

v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program

is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759

F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the

determination of disability under a claim for disability insurance benefits are identical to those

governing the determination under a claim for supplemental security income. *See id.* The court

may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision.

*See id.*

25

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1. An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2. An individual who does not have a "severe impairment" will not be found to be disabled.

3. An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4. If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5. If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies his burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is

capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference

to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis.

*Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.    ISSUE FOR REVIEW

Plaintiff presents only one issue for review:

> The evidence of record must clearly establish the effect of a claimant's impairments upon
> her ability to work. The record contains no assessment from a medical expert that clearly
> establishes the effect of [Plaintiff]'s impairments on her ability to work. Did the ALJ
> harmfully err when he determined the functional effect of [Plaintiff]'s impairments based
> upon his lay interpretation of the medical data of record and his own opinion?

(doc. 11 at 4.)

### A. ***Ripley* Error**

In *Ripley v. Chater*, 67 F.3d 552 (5th Cir. 1995), the claimant argued that the ALJ had

failed to develop the record fully and fairly by finding that he could perform sedentary work even

though there was no medical testimony to support that conclusion. *See* 67 F.3d at 552. The Fifth

Circuit noted that although an ALJ should usually request a medical source statement describing

the types of work that the applicant was still capable of performing, the absence of such a statement

did not necessarily make the record incomplete. *Id.* Rather, the court had to consider whether there

was substantial evidence in the record to support the ALJ's decision. *Id.* The record contained "a

vast amount of medical evidence" establishing that the claimant had a back problem, but it did not

clearly establish the effect of that problem on his ability to work, so the Fifth Circuit found that

the ALJ's RFC determination was not supported by substantial evidence and remanded the case

with instructions to obtain a report from a treating physician. *Id.* at 557-58. Notably, it rejected the

Commissioner's argument that the medical evidence discussing the extent of the claimant's impairment substantially supported the ALJ's RFC assessment, finding that it was unable to determine the effects of the claimant's condition on his ability to work absent reports from qualified medical experts. *Id.* at 558 n.27; *see also Browning v. Barnhart*, No. 1:01-CV-637, 2003 WL 1831112, at *7 (E.D. Tex. Feb. 27, 2003).

Here, after making a credibility finding regarding Plaintiff's alleged symptoms and limitations, and reviewing the evidence of record, the ALJ determined that Plaintiff had the RFC to perform light work, as defined in 20 C.F.R. § 416.967(b), limited to:

> frequently use either upper extremity to reach, handle, finger and feel; could occasionally stoop, crouch, crawl and kneel; could not climb ladders, ropes or scaffolds; could occasionally climb stairs and ramps; could not work in proximity to unprotected heights and dangerous moving machinery; could use foot controls occasionally; could understand, remember and carry out short, simple instructions; could perform simple, routine tasks with no fast-paced high quota production work; could make only simple work related decisions; could adapt to few, if any, workplace changes and could tolerate only occasional interaction with coworkers, supervisors and the general public.

(doc. 8-1 at 20.) He considered that Plaintiff initially alleged disability due to cervical spine with radiculopathy, low back pain, migraines, major depression, bipolar disorder, anxiety, and ADD[6]. (*Id.* at 20 (citing *id.* at 188-98.)) He also considered her testimony that she was unable to work due to chronic neck and back pain and migraines aggravated by sensitivity to light, sound, and heat; had difficulty reaching and grasping; sat in a recliner during the day; could only lift or carry 10 pounds, stand 2 to 3 minutes, walk 100 yards, and sit 5 minutes at a time; and that a number of steroid injections provided only temporary pain relief. (*Id.* at 20-21 (citing *id.* at 32-57.)) He considered that she was prescribed medication for symptoms such as anxiety, mood swings, and

---

[6] Attention deficit hyperactivity disorder (ADHD), predominantly inattentive presentation, "used to be called ADD." Kelli Miller, *ADD vs. ADHD*, WedMd.com, www.webmd.com/add-adhd/childhood-adhd/add-vs-adhd (last visited Jan. 29, 2023).

hyperactivity, that she visited her father-in-law's house and attended two festivals that year, and that she drove when she was not experiencing mood swings. (*Id.* at 21 (citing *id.* at 32-57.))

The ALJ next considered Plaintiff's July 2014 ER medical records of the work-related accident during which she fell face forward and on her knees. (*Id.* (citing id. at 264.)) Although she had complained of face, neck, and bilateral knee pain, examination findings were within normal limits, except for cervical spine tenderness and mild bilateral knee tenderness and soft tissue swelling. (*Id.* (citing *id.* at 266.)) Several CT scans of her cervical spine, facial bones, and head showed no acute fractures and no intracranial abnormalities. (*Id.* (citing *id.* at 270-73.)) He also pointed to the treatment records by Orthopedic Surgeon, who found that Plaintiff had tenderness to palpation and a decreased range of motion of the cervical, thoracic and lumbar spines, positive straight leg raising bilaterally, positive Patrick's/Fabere test, bilateral knee tenderness and crepitus, and a hyper-reflexive right ankle. (*Id.* (citing *id.* at 535-36, 540.)) The ALJ also considered the treatment records from Healthcare Associates beginning in February 2018, which showed a history of diabetes and peripheral neuropathy but no treatment for these conditions during the relevant period, or any "hospitalizations or emergency room visits for any acute complications such as hyperglycemia, hypoglycemia or diabetic ketoacidosis." (*Id.* at 23 (citing *id.* at 388.)) A September 2014 EMG/NCS revealed bilateral C5-6 cervical radiculopathy but no evidence of brachial plexopathy, focal median, radial or ulnar neuropathies in the elbows or wrists, polyneuropathy, neuromuscular transmission defects or myopathy. (*Id.* (citing *id.* at 531-32.)) Plaintiff completed physical therapy from September 2014 to November 2014, during which she "demonstrated improvement in her pain and range of motion" and she returned to work with limitations. (*Id.* (citing *id.* at 550.)) Pain Doctor administered epidural steroid injections and prescribed pain medications, but treatment had been "essentially routine and/or conservative in

nature", and Plaintiff's symptoms were not so severe to warrant surgical intervention or other invasive treatment. (*Id.* (citing *id.* at 519, 521, 523, 525.))

The ALJ also considered that Plaintiff's mental health condition remained "stable" on medication with no hospitalizations or emergency room visits during the relevant period. (*Id.* at 23.)) Mental status examinations revealed she had a "cooperative and friendly" attitude, anxious mood and affect, normal speech, goal-oriented and organized thought process, no hallucinations, no suicidal or homicidal ideation, impaired memory and concentration, and fair insight and judgment. (*Id.* (citing *id.* at 348-51, 353, 356.))

The ALJ expressly stated that he could not "defer or give any specific evidentiary weight, including controlling weight, to any prior administrative medical finding(s) or medical opinion(s), including those from medical sources." (*Id.* at 23.) He did, however, discuss Spouse's July 2020 third party function report. (*Id.* (citing *id.* at 201-08.)) As noted, Spouse alleged that Plaintiff had difficulty with squatting, reaching, kneeling, stair climbing, memory, and completing tasks, but she did not have a problem with sitting, understanding, following instructions, or using her hands. (*Id.* at 206.) She could walk about 15 to 20 feet before needing to rest for about 5 to 10 minutes, had difficulty with concentration, could pay attention for about 10 to 15 minutes, and could follow written and spoken instructions if she did only one step at a time. (*Id.*) Spouse also alleged that Plaintiff did not handle stress or changes well, and that she was anxious when riding in a car. (*Id.* at 207.) The ALJ specifically found that he "d[id] not find that [Spouse]'s attestations establish limitations arising from [Plaintiff]'s medically determinable impairments that are inconsistent with [his] residual functional capacity assessment." (*Id.* at 23.)

The ALJ specifically noted "careful consideration of the entire record", including all symptoms, the extent to which those symptoms were consistent with the objective medical and

other evidence, the medical opinions, and prior administrative findings. (*Id.* at 15-25.) There are no medical opinions in the record regarding the effects of Plaintiff's physical or mental impairments on her ability to work, however.[7] While the ALJ's decision discusses the evidence he considered, and his finding that Plaintiff's allegations were not consistent with the evidence, it does not explain how he determined that despite her impairments, she could perform light work, limited to frequent manipulation with her upper extremities, occasional postural limitations, occasional use of the lower extremities, short simple instructions, simple routine tasks, simple work-related decisions, few workplace changes, and occasional interaction with others. (*Id.* at 20.) He therefore appears to have relied on his own interpretation of the medical and other evidence, which he may not do. *See Williams v. Astrue*, 355 F. App'x 828, 832 n.6 (5th Cir. 2009) ("An ALJ may not—without the opinions from medical experts—derive the applicant's [RFC] based solely on the evidence of his or her claimed medical conditions, [and] an ALJ may not rely on his own unsupported opinion as to the limitations presented by the applicant's medical conditions."); *see also Tyler v. Colvin*, No. 3:15-CV-3917-D, 2016 WL 7386207 (N.D. Tex. Dec. 20, 2016) (finding that an ALJ impermissibly relied on his own medical opinion to develop his RFC determination); *Davis v. Astrue*, No. 1:11-CV-00267-SA-JMV, 2012 WL 6757440 (N.D. Miss. Nov. 6, 2012) ("In formulating a claimant's RFC, the ALJ—a layperson—may not substitute his own judgment for that of a physician."), *adopted by* 2013 WL 28068 (N.D. Miss. Jan. 2, 2013). Consequently, substantial evidence does not support the ALJ's RFC determination. *See Geason v. Colvin*, No. 3:14-CV-1353-N, 2015 WL 5013877, at *5 (N.D. Tex. July 20, 2015) ("Because the ALJ erred in making an RFC determination without medical evidence addressing the effect of Plaintiff's

---

[7] SAMC Hegde noted that there was no physical or mental RFC assessment and or indication that there was a medical opinion from any medical source. (doc. 8-1 at 84-85.)

impairment on her ability to work, the ALJ's decision is not supported by substantial evidence."); *Medendorp v. Colvin*, No. 4:12-CV-687-Y, 2014 WL 308095, at *6 (N.D. Tex. Jan. 28, 2014) (finding because the ALJ rejected the only medical opinion in the record that he had analyzed that explained the effects of the claimant's impairments on her ability to perform work, there was no medical evidence supporting the ALJ's RFC determination); *Lagrone v. Colvin*, No. 4:12-CV-792-Y, 2013 WL 6157164, at *6 (N.D. Tex. Nov. 22, 2013) (finding substantial evidence did not support the ALJ's RFC determination where the ALJ rejected all medical opinions in the record that might explain the effects of the claimant's physical impairments on his ability to perform work and where there were no such opinions as to claimant's mental impairments).

**B.  Harmless Error**

Because "[p]rocedural perfection in administrative proceedings is not required" and a court "will not vacate a judgment unless the substantial rights of a party have been affected," Plaintiff must show she was prejudiced by the ALJ's failure to rely on medical opinion evidence in assessing her RFC. *See Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988) (per curiam). To establish prejudice, she must show that the ALJ's failure to rely on a medical opinion as to the effects that her impairments had on her ability to work casts doubt onto the existence of substantial evidence supporting the disability determination. *See McNair v. Comm'r of Soc. Sec. Admin.*, 537 F. Supp. 2d 823, 837 (N.D. Tex. Mar. 6, 2008) ("Procedural errors in the disability determination process are considered prejudicial when they cast doubt onto the existence of substantial evidence in support of the ALJ's decision.") (citing *Morris v. Bowen*, 864 F.2d 333, 335 (5th Cir. 1988)).

Contrary to the Commissioner's contentions, the ALJ's failure to rely on a medical opinion regarding Plaintiff's physical and mental RFC casts doubts as to whether substantial evidence exists to support the finding that she is not disabled. *See Thornhill v. Colvin*, No. 3:14-CV-335-M,

2015 WL 232844, at *11 (N.D. Tex. Jan. 16, 2015), at *11 (finding prejudice "where the ALJ could have obtained evidence that might have changed the result—specifically, a medical source statement"); *Laws v. Colvin*, No. 3:14-CV-3683-B, 2016 WL 1170826 (N.D. Tex. Mar. 25, 2016) (reversing and remanding for further proceedings for lack of substantial evidence because the ALJ failed to rely on a medical opinion in determining the plaintiff's RFC). Accordingly, the error is not harmless, and remand is required on this issue.

## IV.    CONCLUSION

The Commissioner's decision should be **REVERSED**, and the case should be **REMANDED** for further proceedings.

**SO ORDERED** on this 31st day of January, 2023.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE